<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| MATRIX DEVELOPMENT GROUP and FIDELCO REALTY GROUP, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF NEWARK, NEW JERSEY, <br><br> Defendant, <br><br> ESSEX COUNTY BUILDING AND CONSTRUCTION TRADES COUNCIL, <br><br> Intervenor-Defendant. | Case No. 2:20-cv-03166 (BRM) (ESK) <br><br> **OPINION** |

**MARTINOTTI, DISTRICT JUDGE**

Before this Court are three Motions: (1) Defendant City of Newark's ("Newark") Motion to Dismiss (ECF No. 14) Matrix Development Group and Fidelco Realty Group's ("Plaintiffs") Complaint (ECF No. 1); (2) Intervenor-Defendant Essex County Building and Construction Trades Council's ("Essex") (together with Newark, "Defendants") Motion to Dismiss (ECF No. 15) Plaintiffs' Complaint; and (3) Plaintiffs' Cross Motion for Judgment on the Pleadings (ECF No. 19). Plaintiffs oppose both Motions to Dismiss. (ECF No. 16.) Having reviewed the parties' submissions filed in connection with the Motions and having declined to hold oral argument pursuant to Federal Rule of Civil Procedure 78(b), for the reasons set forth below, and for good cause shown, the Defendants' Motions to Dismiss are **GRANTED** and Plaintiffs' Motion for Judgment on the Pleadings is **DENIED**.

I.     BACKGROUND

For the purposes of the Motions to Dismiss, the Court accepts the factual allegations in the Complaint as true and draws all inferences in the light most favorable to Plaintiffs. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). Further, the Court also considers any "document *integral to or explicitly relied upon* in the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

Plaintiffs are real estate developers with properties and potential projects in Newark. (ECF No. 1 ¶ 1.) Plaintiffs challenge an ordinance adopted by Newark (the "Ordinance") that "purports to impose specific requirements, including a Project Labor Agreement ('PLA') and Apprenticeship Program that exponentially increase the costs of the projects" falling under the Ordinance's reach. (*Id.*) Newark enacted the Ordinance on October 2, 2019. (*Id.* ¶ 7.) Plaintiffs attached the Ordinance to the Complaint as Exhibit A and have also cited portions of the Ordinance in the Complaint. (*Id.*) Accordingly, the Court will consider the Ordinance for the Motions to Dismiss.

Section 2:4-22D.2 of the Ordinance provides:

> All Redevelopment projects and all requests for proposals, specifications and final contracts for Public Works Projects shall require the execution of a Project Labor Agreement that complies with the requirements of this Section, unless the Business Administrator determines, taking into consideration the amount of City financial resources required and the increased cost and feasibility challenges that would result to the Project, the nature, phasing, size and complexity of the project, including the height of the buildings, the presence or absence of elevators and the utilization or non-utilization of steel, that a Project Labor Agreement is not appropriate. In all cases, the Project Labor Agreement must advance the interests of the City of Newark, including cost, efficiency, quality, time, time lines and need for a skilled labor force and safety.

(*Id.* ¶ 8.) The Ordinance defines a "Redevelopment Project" as:

> [A] project, including demolition and hazardous materials abatement, that has an estimated total construction cost that is equal

to or exceeds Twenty-Five Million Dollars and Zero Cents ($25,000,000), exclusive of any land acquisition costs, for which the City has (1) granted a tax abatement pursuant to the Five-Year Exemption and Abatement Law, N.J.S.A. 40A:20-1 *et seq.*, and (2) granted some form of Redevelopment Area Financing, such as but not limited to the Redevelopment Area Bond Financing Law, N.J.S.A. 40A:12A-64, *et seq.* (the "RAB Law"), capital financing pursuant to the Local Redevelopment and Housing Law, N.J.S.A. 40A:12A-1, *et seq.*, a Community Development Block Grant (CDBG), a direct payment by the City in the form of rent or any other municipal or UEZ capital financing/funding.

(*Id.* ¶ 9.)

The Ordinance imposes "certain requirements on Redevelopment Projects that fall within its purview, including a Project Labor Agreement ('PLA') and Apprenticeship Program." (*Id.* ¶ 12.) A PLA is defined as "a pre-hire collective bargaining agreement between a Labor Organization and the City of Newark or a Developer, as the situation dictates, that contains at a minimum the requirements set forth" throughout the Ordinance. (*Id.* ¶ 13.) Some of the requirements for a qualifying PLA include:

A. A guarantee that there will be no strikes, lock-outs or other similar actions.

B. Set forth effective, immediate and mutually binding procedures for resolving jurisdictional and labor disputes arising before the completion of the work.

C. A provision to bind all contractors, and subcontractors on the project in all relevant documents, including bid specifications.

D. Evidence that each contractor and subcontractor working on the project has an Apprenticeship Program.

E. A requirement that twenty (20%) percent of the labor hours required shall be performed by Apprentices and that one hundred (100%) percent of the Apprentices shall be Newark residents. . . .

G. State that contractors and subcontractors need not be a party to a Labor Agreement with the applicable labor organization other

3

> than for the project covered by the Project Labor Agreement
> . . . .

(*Id.* ¶ 14.)

The Ordinance defines an "Apprentice" as "a worker who participates in a Federal Apprenticeship Program and receives benefits and pay not less than those received by an apprentice." (*Id.* ¶ 15.) An "Apprenticeship Program" means an "apprenticeship program providing to each trainee combined classroom and on-the-job training under the direct and close supervision of a highly skilled worker . . . and registered by the Bureau of Apprenticeship and Training of the U.S. Department of Labor and meeting the standards established by the Bureau." (*Id.*) Lastly, Section 2:4-22D.5 permits Newark to undertake the following remedies if a Developer fails to comply with the Ordinance: (1) suspend or terminate the contract, grant, subsidy agreement or tax abatement agreement in question; (2) for public construction projects, debarring the Developer, Contractor or Subcontractor from eligibility for future City contracts; and (3) such other remedies available at law or in equity. (*Id.* ¶ 16.)

Plaintiffs allege the PLA requirement contained in the Ordinance creates significant obstacles to the Plaintiffs' ability to pursue and construct redevelopment projects. (*Id.* ¶ 17.) These obstacles play out as substantial additional costs that leave Plaintiffs on an uneven playing field with unionized contractors. (*Id.*) According to Plaintiffs, they do not have established collective bargaining relationships, would experience a 20% or more increase in labor costs, would be required to hire employees through a union hiring hall in accordance with hall hiring rules, and would be similarly restricted by the PLA in its hiring of subcontractors. (*Id.*)

Plaintiffs allege they will be harmed from purchasing and redeveloping property subject to the Ordinance because of the PLA requirement. (*Id.* ¶¶ 18–19.) Plaintiffs allege they "are ready, willing, and able to purchase properties for redevelopment projects and to construct redevelopment

projects on the properties they currently own to which the Ordinance has been or will be applied." (*Id.* ¶ 20.) However, Plaintiffs claim the Ordinance would require them to "(i) recognize a labor organization as the collective bargaining representative of their respective employees without their employees' consent; (ii) assent to a [PLA] requiring them to be bound by any collective bargaining agreement; and (iii) agree to a collective bargaining agreement containing numerous onerous requirements." (*Id.*) Plaintiffs assert the Ordinance will continue to deter them from purchasing properties for redevelopment projects "including those in which the City of Newark has no property or proprietary interest, and is therefore not acting as a 'market participant.'" (*Id.* ¶ 21.) Plaintiffs also allege "the requirement that all apprentices on projects subject to a PLA be residents of the City of Newark impacts the employment of Plaintiffs' employees." (*Id.* ¶ 22.)

Plaintiffs filed their Complaint with this Court on March 23, 2020, alleging National Labor Relations Act ("NLRA") Preemption under the Supremacy Clause (Count I); violation of the Privileges/Immunities and/or the Commerce Clause (Count II); Employee Retirement Income Security Act ("ERISA") Preemption (Count III); violations of the New Jersey Civil Rights Act and New Jersey State Constitution (Count IV); violations of 42 U.S.C. § 1983 (Count V); and declaratory judgment (Count VI). (*See* ECF No. 1.) On April 14, 2020, Essex filed a Motion to Intervene (ECF No. 4), which was granted by Magistrate Judge Joseph A. Dickinson on May 22, 2020. (ECF No. 9.) On November 3, 2020, Defendants filed Motions to Dismiss. (ECF Nos. 14, 15.) Also on November 3, 2020, Plaintiffs filed an Opposition to Newark's Motion to Dismiss. (ECF No. 16.) On the same day, Newark filed a Reply (ECF No. 18) and Plaintiffs filed a Cross Motion for Judgment on the Pleadings. (ECF No. 19.) On November 4, 2020, Essex filed a Reply to Plaintiffs' Opposition. (ECF No. 20.)

## II.   LEGAL STANDARDS

### A.   Federal Rule of Civil Procedure 12(c)

Federal Rule of Civil Procedure 12(c) provides: "After the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). Pursuant to Rule 12(c), the movant for judgment on the pleadings must establish: (1) that no material issue of fact remains to be resolved; and (2) the entitlement to judgment as a matter of law. *See Rosenau v. Unifund Corp.*, 539 F.3d 218, 221 (3d Cir. 2008) (citing *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 290–91 (3d Cir. 1988). In resolving a motion made pursuant to Rule 12(c), the Court must view the facts in the pleadings and the inferences therefrom in the light most favorable to the non-movant. *See id.*

Furthermore, even though a motion for judgment on the pleadings is appropriate after the pleadings have been closed, such a motion is reviewed under the same standards that apply to a motion to dismiss made under Rule 12(b)(6). *See Szczurek v. Pro. Mgmt. Inc.*, 627 F. App'x 57, 60 (3d Cir. 2015) (citing *Revell v. Port Auth. of N.Y. & N.J.*, 598 F.3d 128, 134 (3d Cir. 2010)); *see also Muhammad v. Sarkos*, Civ. A. No. 12-7206, 2014 WL 4418059, at *1 (D.N.J. Sept. 8, 2014) ("Where a defendant's motion is one for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), it is treated under the same standards as a Rule 12(b)(6) motion where it alleges that a plaintiff has failed to state a claim.") (citing *Turbe v. Gov't of V.I.*, 938 F.2d 427, 428 (3d Cir. 1991)); *Gebhart v. Steffen*, 574 F. App'x 156, 157 (3d Cir. 2014).

### B.   Federal Rule of Civil Procedure 12(b)(6)

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court is "required to accept as true all factual allegations in the complaint and draw all inferences in the facts alleged in the light most favorable to the [plaintiff]." *Phillips*, 515 F.3d at

228. "[A] complaint attacked by a . . . motion to dismiss does not need detailed factual allegations." *Bell Atl. v. Twombly*, 550 U.S. 544, 555 (2007). However, the plaintiff's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286. Instead, assuming the factual allegations in the complaint are true, those "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for misconduct alleged." *Id.* This "plausibility standard" requires the complaint allege "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a 'probability requirement.'" *Id.* (quoting *Twombly*, 550 U.S. at 556). "Detailed factual allegations" are not required, but "more than an unadorned, the defendant-unlawfully-harmed-me accusation" must be pled; it must include "factual enhancements" and not just conclusory statements or a recitation of the elements of a cause of action. *Id.* (citing *Twombly*, 550 U.S. at 555, 557).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

While as a general rule, a court may not consider anything beyond the four corners of the complaint on a motion to dismiss pursuant to 12(b)(6), the Third Circuit has held "a court may consider certain narrowly defined types of material without converting the motion to dismiss [to one for summary judgment pursuant under Rule 56]." *In re Rockefeller Ctr. Props. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir.1999). Specifically, courts may consider any "'document *integral to or explicitly relied upon* in the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426.

## III.   DECISION

### A.   Ripeness

Before turning to the merits of the underlying motions, the Court will address the ripeness of Plaintiffs' claims. Newark argues Plaintiff's Complaint is not ripe for review by this Court. (ECF No. 14-1 at 24.) "The ripeness doctrine, like other justiciability doctrines, derives ultimately from the requirement in Article III of the United States Constitution that federal courts are only empowered to decide cases and controversies." *Felmeister v. Off. of Att'y Ethics, a Div. of the N.J. Admin. Off. of the Cts.*, 856 F.2d 529, 535 (3d Cir. 1988). Defendants do not move to dismiss under Federal Rule of Civil Procedure 12(b)(1) nor do they argue Plaintiffs' claims fail to establish a case or controversy such that this Court does not have subject matter jurisdiction. However, the Third Circuit "has recognized that considerations of ripeness are sufficiently important that we are required to raise the issue *sua sponte* even though the parties do not." *Id.* (citing *Suburban Trails, Inc. v. N.J. Trans. Corp.*, 800 F.2d 361, 365 (3d Cir. 1986)). Therefore, the Court will *sua sponte*[1]

---

[1] To clarify, while Newark raised ripeness issues with Plaintiffs' Complaint, the issue of whether Plaintiffs presented a case or controversy was not specifically briefed by the parties, so the Court will raise and decide that issue *sua sponte*.

decide whether Plaintiffs' claims present a case or controversy before addressing the merits of Defendants' Motions to Dismiss.

"At its core, ripeness works 'to determine whether a party has brought an action prematurely . . . and counsels abstention until such a time as a dispute is sufficiently concrete to satisfy the constitutional and prudential requirements of the doctrine.'" *Plains All Am. Pipeline LP v. Cook*, 866 F.3d 534, 539 (3d Cir. 2017) (quoting *Peachlum v. City of York*, 333 F.3d 429, 433 (3d Cir. 2003)). "In declaratory judgment cases, we apply a somewhat refined test for ripeness," and analyze "(1) the adversity of the parties' interests, (2) the conclusiveness of the judgment, and (3) the utility of the judgment." *Id.* (internal quotation marks and citations omitted). To establish adversity of the parties' interests, "a plaintiff need not suffer a completed harm." *Armstrong World Indus., Inc. by Wolfson v. Adams*, 961 F.2d 405, 412 (3d Cir. 1992) (citing *Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983)).

Newark argues Plaintiffs' Complaint is not ripe because Plaintiffs "have not identified any projects that would be or have been subject to the Ordinance." (ECF No. 14-1 at 24.) Plaintiffs contend their allegations sufficiently demonstrate harm. (ECF No. 16-1 at 31.)

Under the first factor, the Supreme Court has noted "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979) (quoting *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923)). Here, Plaintiffs allege "[t]he requirements of the Ordinance have and will continue to deter Plaintiffs from purchasing properties for redevelopment projects and proposing redevelopment projects on properties they currently own." (ECF No. 1 ¶ 21.) Specifically, Plaintiffs allege the PLA requirement in the Ordinance imposes "substantial additional costs that leave Plaintiffs on an uneven playing field with

unionized contractors" because Plaintiffs do not have established collective bargaining relationships; would experience at least a 20% increase in labor costs; would be required to hire employees through a union hall, and not in accordance with their own standards; and would be restricted in hiring subcontractors that also comply with the PLA. (*Id.* ¶ 17.) Nearly identical allegations presented no ripeness issue in *Associated Builders & Contractors Inc. N.J. Chapter v. City of Jersey City, N.J. (*"*Jersey City*"*)*, 836 F.3d 412 (3d Cir. 2016). There, a collection of builders and contractors alleged, as here, that they were deterred from bidding on certain projects in Jersey City covered by the city's ordinance, because:

> they ha[d] no established relationships with any union and ha[d] never worked under PLAs; they would have to hire employees through a union hiring hall and not in accordance with their own standards; they would be restricted to hiring only subcontractors that also comply with PLAs; and they would have to force their employees to comply with an agreement negotiated by a union regardless of their employees' desires.

*Id.* at 415.

Courts have found ripeness in reviewing similar challenges. *See Surrick v. Killion*, 449 F.3d 520, 528 (3d Cir. 2006) (finding the threat of sanctions deterring an attorney from opening a law office "sufficiently real and substantial to satisfy" the adversity of parties' interest prong); *R.I. Hosp. Ass'n v. City of Providence ex rel. Lombardi*, 775 F. Supp. 2d 416, 425 (D.R.I.), *aff'd*, 667 F.3d 17 (1st Cir. 2011) (finding action seeking to enjoin a municipal ordinance ripe when plaintiffs alleged the ordinance interfered with contractual relationships and ongoing negotiations and "the Ordinance became effective immediately on passage" and "involve[d] purely legal issues"); *Associated Builders & Contractors of R.I., Inc. v. City of Providence*, 108 F. Supp. 2d 73, 77 (D.R.I. 2000) ("When contractors and employees are deterred from bidding or working on projects because of state or local encroachment of their federal rights, they sustain an injury."); *Associated*

10

*Gen. Contractors of Am. v. Metro. Water Dist. of S. Cal.*, 159 F.3d 1178, 1181 (9th Cir. 1998) (finding plaintiff contractors challenging public agency's policy of requiring PLAs on its large construction projects established injury in fact by alleging they "regularly bid on public projects and are being deterred from bidding on these projects because of the PLAs alone"); *Rd.-Con, Inc. v. City of Philadelphia*, 449 F. Supp. 3d 476, 485 (E.D. Pa. 2020). Therefore, the Court finds this first factor satisfied.

As to conclusiveness, the second factor, "a factual record is not as important where the question presented is 'predominantly legal,' such as one of federal preemption." *Armstrong World Indus., Inc. by Wolfson*, 961 F.2d at 412 (quoting *Pacific Gas & Elec. Co.*, 461 U.S. at 201); *see also Surrick*, 449 F.3d at 528 ("Cases presenting predominantly legal questions are particularly 'amenable to a conclusive determination in a [pre-enforcement] context,' and generally require less factual development" (quoting *Presbytery of N.J. of Orthodox Presbyterian Church v. Florio*, 40 F.3d 1454, 1468 (3d Cir. 1994))). Here, Plaintiffs allege the Ordinance is preempted by ERISA and the NLRA. (*See* ECF No. 1 ¶¶ 28–42, 49–53.) Plaintiffs also allege the Ordinance's requirement that all apprentices be residents of Newark violates the Privileges and Immunities Clause because it discriminates against individuals residing elsewhere. (*Id.* ¶¶ 43–48.) Since Plaintiffs' claims involve federal preemption and "predominantly legal" questions, the Court discerns no reason why "disposition of this case could not conclusively determine the legal issues in dispute." *Surrick*, 449 F.3d at 529. Additionally, because Plaintiffs exclusively challenge the constitutionality of the Ordinance, further factual development is not needed to resolve its claims. *See, e.g.*, *Presbytery of N.J. of the Orthodox Presbyterian Church v. Florio*, 902 F. Supp. 492, 507 (D.N.J. 1995), *aff'd sub nom.*, *Presbytery of N.J. of the Orthodox Presbyterian Church v. Whitman*, 99 F.3d 101 (3d Cir. 1996) ("Since Plaintiff mounts a facial challenge to constitutionality of these

three NJLAD provisions, factual development would add little, if anything, to resolution of Plaintiff's First Amendment claims."). Therefore, the Court finds this second factor weighs in favor of finding Plaintiffs' challenges to the Ordinance ripe for review.

The third factor requires courts to "examine the utility of judgment." *Plains All Am. Pipeline L.P.*, 866 F.3d at 543. "Practical utility goes to whether the parties' plans of actions are likely to be affected by a declaratory judgment . . . and considers the hardship to the parties of withholding judgment." *NE Hub Partners, L.P. v. CNG Transmission Corp.*, 239 F.3d 333, 344–45 (3d Cir. 2001) (internal quotation marks omitted). The Court finds this factor satisfied as well. Plaintiffs seek "a declaration that those portions of the Ordinance in which the City of Newark is acting as a regulator, as opposed to a 'market participant,'" be held invalid, and "seek a further declaration that the Ordinance's residential hiring preferences violates both the Privileges and Immunities Clause, and Commerce Clause, of the United States Constitution." (ECF No. 1 ¶¶ 64–65.) Here, a declaratory judgment would provide legal clarity as to whether (1) the Ordinance's financing provisions render Newark a market participant or market regulator, and whether (2) the Ordinance's residential hiring preferences violate the Privileges and Immunities Clause and Commerce Clause, which would serve the purposes of the Declaratory Judgment Act by "clarify[ing] legal relationships" so Plaintiffs "c[an] make responsible decisions about the future." *Step-Saver Data Sys., Inc. v. Wyse Tech.*, 912 F.2d 643, 649 (3d Cir. 1990); *see also Bradfield v. Heartland Payment Sys., LLC*, Civ. A. No. 17-4862, 2018 WL 5784998, at *8 (D.N.J. Nov. 5, 2018) (finding the "practical utility" factor met because "[a] declaratory judgment would alleviate uncertainty as to the legality of the RM Agreement's restrictive covenants. Plaintiff, working for a competitor of Heartland, would then be able conduct himself accordingly"). Therefore, because all three factors are met, the Court finds Plaintiffs' claims present a case or controversy and are

ripe for review. Accordingly, the Court will now address the merits of Defendants' Motions to Dismiss.

**B.    Defendants' Motions to Dismiss**

Newark argues Plaintiffs' Complaint should be dismissed because Plaintiffs do not plead facts showing Newark is not a market participant in "securing and coordinating the various types of redevelopment funding for projects subject to the Ordinance." (ECF No. 14-1 at 6.) Similarly, Newark argues Plaintiffs' NLRA and ERISA claims should be dismissed because the Ordinance, amended in response to *Jersey City*, applies to projects where Newark is acting as a market participant, which means it would not be precluded from imposing restrictions here. (*Id.* at 7.) Because these claims depend on whether Newark is acting as a market participant under the Ordinance, the Court will consider them together.

**1.    NLRA and ERISA Preemption Claims (Counts I and III)**

Newark argues its Ordinance, which was amended after *Jersey City*, advances its interest as a financier of projects. (ECF No. 14-1 at 11.) As a result of the 2019 amendment, the Newark PLA Ordinance only applies to projects that have been granted "Redevelopment Area Financing." (*Id.*) Newark notes this Redevelopment Area Financing can come through (1) the Redevelopment Area Bond Financing Law; (2) the Local Redevelopment and Housing Law; (3) a Community Development Block Grant ("CDBG"); (4) a direct payment by Newark as rent; or (5) any other municipal or capital financing. (*Id.*) Ultimately, Newark argues the amended Ordinance, and each of the funding mechanisms referenced in it, only allows Newark to use "its own funds or federal or state funds which [it] is explicitly authorized to administer" which renders it an "investor, owner or financier" and therefore, a market participant. (*Id.* at 14.)

Plaintiffs concede direct payments by Newark in the form of rent "would not result in preemption" because Newark's direct financing "would render it a market participant." (ECF No. 16-1 at 12.) However, Plaintiffs contend "(1) [Newark] lacks a proprietary interest in RABs issued by the NJEDA or a similar authority in which it is not a constituent, and (2) [Newark] lacks a proprietary interest in RABs it issues and then assigns." (*Id.* at 17.) Additionally, Plaintiffs argue Newark's use of federal funds through CDBGs requires an additional level of analysis under *White v. Mass. Council of Constr. Emps., Inc. et al*, 460 U.S. 204 (1983), because Newark "is not expending its own funds when it requires a PLA with the grant of CDBG funding" and if federal funds "are used as directed, the dormant Commerce Clause will not apply." (*Id.* at 21.) In other words, Plaintiffs argue that, based on *White*, Newark's use of federal funds as Congress directed does not trigger application of the dormant Commerce Clause because such spending was an act "countenanced by Congress." (*Id.* at 20.) Without support, Plaintiffs argue the holding in *White* should similarly not trigger the NLRA and ERISA preemption principles. (*Id.* at 21.)

Based on Plaintiffs' opposition, only the RABs[2] and CDBGs are subject to preemption. (ECF No. 16-1 at 12.) The direct payments by the City in the form of rent and "any other municipal

---

[2] Newark mentions the Ordinance includes capital financing through the "Local Redevelopment and Housing Law" as a form of "Redevelopment Area Financing." (ECF No. 14-1 at 12.) Similar to the RAB Law, Newark contends the "Local Redevelopment and Housing Law" allows a municipality "to issue bonds in connection with those redevelopment projects either directly or through its redevelopment entity." (*Id.* at 13.) Plaintiffs argue "the RAB Law is part of the Local Redevelopment and Housing Law" and note neither Newark nor Essex offers "any argument as to the Local Redevelopment and Housing Law outside of RABs." (ECF No. 16-1 at 17–18 n.4.) The "Local Redevelopment and Housing Law" is located at N.J. Stat. Ann. § 40A:12A-1 to -49. *See RLR Invs., LLC v. Town of Kearny*, 386 F. App'x 84, 85 (3d Cir. 2010) (noting claim under "New Jersey's Local Redevelopment and Housing Law, N.J.S.A. 40A:12A-1 to -49."). The RAB Law begins at N.J. Stat. Ann. § 40A:12A-64 and is not part of the Local Redevelopment and Housing Law. However, the RAB Law references the "Local Redevelopment and Housing Law" as an avenue through which a municipality may issue bonds. *See* N.J. Stat. Ann. § 40A:12A-67 ("The municipality may issue bonds itself in the manner provided for herein or pursuant to the 'Local Redevelopment and Housing Law.'"). However, the Court will not address the challenges to

14

or UEZ capital financing/funding" are not at issue on the Motions to Dismiss. (*See id.*) At this

juncture, the Court will assess the preemption arguments under those challenged forms of funding.

When a government "acts as a 'market participant with no interest in setting policy,' as

opposed to when it 'acts as a regulator,' it does not offend" federal law. *Chamber of Commerce of*

*U.S. v. Brown*, 554 U.S. 60, 70 (2008) (quoting *Bldg. & Constr. Trades Council of the Metro. Dist.*

*v. Associated Builders & Contractors of Mass./R.I., Inc.* (*Bos. Harbor*), 507 U.S. 218, 229 (1993)).

The NLRA, ERISA, and the dormant Commerce Clause "share the same threshold requirement

before their constraints are triggered: that the allegedly unlawful conduct by the state or local

government be *regulatory* in nature." *Jersey City*, 836 F.3d 417. Therefore, "[i]f a state or local

government is acting as a market participant pursuant to a proprietary interest, it is not so

constrained by these federal laws or by the relevant preemption doctrines." *Id.* (citing Supreme

Court and Third Circuit cases involving Commerce Clause and NLRA preemption).[3]

The Third Circuit employs a two-part test to determine whether a state or local government

acts as a market participant. *See id.* First, the court asks whether "the challenged funding condition

---

funding under the Local Redevelopment and Housing Law, since the parties provide practically
no briefing on the issue. And Plaintiffs only allege the issuance of tax abatements or RABs render
Newark a market participant, not bonds issued pursuant to the Local Redevelopment and Housing
Law. (ECF No. 1 ¶¶ 38–42.)

[3] The Third Circuit in *Jersey City* did not explicitly hold that the market participation is defined in
the ERISA context the same way it is defined in the NLRA and Commerce Clause context, but
noted "other Circuits have concluded the same jurisprudence" defining market participation in the
NLRA and Commerce Clause context "defines 'market participation' in the ERISA context as
well." 836 F.3d at 418 n.7. Tellingly, other district courts in this circuit have applied the market
participant exception in the ERISA context, and this Court will do the same. *See Lott Constructors,
Inc. v. Camden Cty. Bd. of Chosen Freeholders*, Civ. A. No. 93-5636, 1994 WL 263851, at *20
(D.N.J. Jan. 31, 1994); *Associated Builders & Contractors, E. Pennsylvania Chapter, Inc. v. Cty.
of Northampton*, 376 F. Supp. 3d 476, 520 (E.D. Pa. 2019), *aff'd sub nom. Associated Builders &
Contractors E. Pennsylvania Chapter Inc v. Cty. of Northampton*, 808 F. App'x 86 (3d Cir. 2020);
*Associated Builders & Contractors, Inc. v. New Castle Cty.*, 144 F. Supp. 3d 633, 639 (D. Del.
2015).

serve[s] to advance or preserve the state's proprietary interest in a project or transaction, as an investor, owner, or financier." *Hotel Employees & Rest. Employees Union, Local 57 v. Sage Hosp. Res., LLC* ("*Sage*"), 390 F.3d 206, 216 (3d Cir. 2004); *Jersey City*, 836 F.3d at 418 (adopting and applying the two-part *Sage* test). Second, the court asks whether "the scope of the funding condition [is] 'specifically tailored' to the proprietary interest." *Sage*, 390 F.3d at 216; *Jersey City*, 836 F.3d at 418. Therefore, to determine whether the Ordinance is preempted by ERISA and the NLRA, the Court must first determine whether Newark acts as a market participant or market regulator with respect to the Ordinance.

### i.    *Sage* Step One

The Court will apply *Sage* to determine whether Newark acts as a market participant with respect to: (1) funds it issues through the RAB Law; and (2) CDBG funds it administers to projects under the Ordinance. At this first step, the Court must determine whether "the challenged funding condition serve[s] to advance or preserve the state's proprietary interest in a project or transaction, as an investor, owner, or financier." *Sage*, 390 F.3d at 216.

### a.    Funding under the RAB Law

Newark argues the statutory framework in *Sage* "specified that the bonds are non-recourse unless and until the municipality guaranteed the payment of the bonds," like the RAB framework at issue here, and the Third Circuit in *Sage* did not limit its holding "to only that subset of bonds for which the city affirmatively guaranteed payment." (ECF No. 14-1 at 15–16.) Plaintiffs specify "[a]s a matter of practice, virtually all RABs are issued by the NJEDA, not the City of Newark, and the City almost always assigns the bonds on a non-recourse basis," which means Newark does not retain any financial or economic interest. (ECF No. 16-1 at 14.) Plaintiffs allege "[a]t bottom, RABs are not an obligation of the City of Newark," and "are not direct city funding." (ECF No. 1

¶¶ 38–39.) Instead, Plaintiffs allege "RABs are non-recourse obligations unless a municipality pledges its full faith and credit to back the bond" and if that is not done, "a municipality does not assume any financial or economic risk through the issuance of a RAB and is not 'providing funding for the project.'" (*Id.* ¶ 40.) Further, Plaintiffs argue *Sage* "demonstrates why the issuance of RABs on Redevelopment Projects, absent actual funding or backing by the City, subjects the City of Newark to preemption." (ECF No. 16-1 at 14–15.)

In *Sage*, the Third Circuit confronted the issue of whether certain bonds issued by a city agency provided the city with a proprietary interest in a hotel construction project. *See* 390 F.3d 206, 208. Sage Hospitality Resources, LLC ("Sage") approached the Urban Redevelopment Authority of Pittsburgh ("URA") for tax increment funding ("TIF") to develop a hotel construction project in Pittsburgh, Pennsylvania. *Id.* The URA "[was] comprised of the City of Pittsburgh ('City'), the School District of Pittsburgh, and Allegheny County." *Id.* at 208 n.1. "In a traditional TIF scheme" the Third Circuit noted, "a locality issues tax increment bonds to finance the development of a chosen district." *Id.* The bonds "are secured by tax revenues generated from the expected increase in property value—i.e., the tax increment—in the district." *Id.* (citations omitted). Put another way, the increase in tax revenues generated by a project are used to pay off the debt a locality issues through bonds. *See id.* Under the financing plan at issue in *Sage*, "sixty percent of revenues from the tax increment would go toward repayment of the TIF notes." *Id.* Any excess revenues of this sixty percent, after revenues were applied to debt service, would be "applied by the URA to other development activities in the TIF district." *Id.* at 217. The other "forty percent . . . would be provided to the three taxing bodies, the City, the School District, and Allegheny County." *Id.* at 208. In connection with the issuance of TIF funds, the City passed an

ordinance requiring contractors to be signatories to collective bargaining agreements where the City had a financial or proprietary interest. *Id.*

In determining whether the City had a proprietary financial interest in the project, the Third Circuit noted that an interest in increased tax revenue "is governmental, not proprietary, because it is not comparable to the financial interest that an ordinary market participant has in a project." *Id.* at 216. Therefore, the forty percent of any increased tax revenues realized under the TIF program "flow to the City and other government agencies" where "the City's interest is nothing more or less than the traditional government interest in maximizing tax receipts." *Id.* However, the court emphasized "the City is also a constituent in the URA—itself a public agency" which means "the City is a partner in the proprietary interests of the URA itself." *Id.* The court specified the URA, "as issuer of the TIF bonds[,] has a proprietary financial interest in the TIF development project that is the same as that of any (nonprofit) private entity that finances a development by issuing bonds." *Id.* at 216–17. Further, because any revenues remaining after debt service would be used by the URA towards other development projects in the TIF district, "the URA's interest in the success of the project that will yield tax revenues is precisely that of any developer who is relying upon cash flow to support debt service, repay bonds, and finance other development." *Id.* at 217. Because of its "considerable investment through the URA" the court found "the City acted as a reasonable investor," and the ordinance passed by the City was exempt from preemption review. *Id.* at 218.

In *Jersey City*, developers and a non-profit organization challenged a Jersey City ordinance, which conditioned tax abatements to private developers on the developers' entry into PLAs with labor unions, on the grounds it was preempted by ERISA, the NLRA, and barred by the dormant Commerce Clause. *See* 836 F.3d at 412–13. The Third Circuit decided the case at the

first step of the *Sage* test, finding Jersey City lacked a proprietary interest in tax abated projects. *Id.* at 418. It noted "[t]he Supreme Court has recognized a government's proprietary interest in a project when it 'owns and manages property' subject to the project or it hires, pays, and directs contractors to complete the project, when it provides funding for the project, or when it purchases or sells goods or services." *Id.* (internal citations omitted). The court clarified that Jersey City's reduction in the developer's tax burden was not "direct state involvement in the market" because Jersey City "does not purchase or otherwise fund the services of private developers or contractors who are constructing Tax Abated Projects or the goods used in those projects; nor does it sell those services or goods or invest, own, or finance the projects." *Id.* at 419.

Here, the Ordinance was specifically amended by Newark to apply to a narrow set of projects: (1) public projects, which are not challenged by Plaintiffs; and (2) private projects receiving funding through redevelopment dollars, which includes funding pursuant to the RAB Law. Importantly, the Ordinance defines a "Redevelopment Project" as one receiving *both* a tax abatement and some form of Redevelopment Area Financing, which includes financing under the RAB Law. (Ordinance, Ex. A (ECF No. 1.) at § 2:4-22D.1.) Newark amended the Ordinance in response to *Jersey City* by redefining "Redevelopment Project" to include projects receiving Redevelopment Area Financing. If Newark had left the Ordinance unamended, and only required PLAs to apply to projects that received tax abatement, a preemption analysis would be necessary, as a municipality's issuance of tax abatements alone does not render it a market participant. *See Jersey City*, 836 F.3d at 419 ("The exemptions thus do not give the City a proprietary interest in Tax Abated Projects, and we need not reach step two of the *Sage* test to conclude that the City is not acting as a market participant when it enforces the Ordinance."). But the inclusion of

Redevelopment Area Financing, which includes funding pursuant to the RAB Law, changes the outcome.

Under the RAB Law applicable here, municipalities have the option to issue bonds in either a recourse or non-recourse fashion. The statute provides:

> [B]onds issued pursuant to this section may be issued as non-recourse obligations, and unless otherwise provided for by a separate action of the municipality to guarantee such bonds or otherwise provide for a pledge of the municipality's full faith and credit shall not, except for such action, be considered to be direct and general obligations of the municipality, and, absent such action, the municipality shall not be obligated to levy and collect a tax sufficient in an amount to pay the principal and interest on the bonds when the same become due and payable.

N.J. Stat. Ann. § 40A:12A-67(d).

Plaintiffs allege "RABs are non-recourse obligations unless a municipality pledges its full faith and credit back to the bond . . . a municipality does not assume any financial or economic risk through the issuance of a RAB," and therefore, is not providing funding for the project. (ECF No. 1 ¶ 40.)

While the court in *Sage* did not directly address whether issuing non-recourse bonds rendered a municipality a regulator, as opposed to a market participant, it did uphold a similar bond-issuing scheme as the one here. The bond-issuing scheme at issue in *Sage* was Pennsylvania's Tax Increment Financing Act, 53 Pa. Cons. Stat. § 6930.1 *et seq. See Sage*, 390 F.3d at 208. The statute provided, in relevant part:

> Tax increment bonds or notes are payable in whole or in part from the tax increment fund. To the extent that bonds or notes are payable in whole, each bond or note shall contain recitals as are necessary to show that it is only so payable and that it does not constitute an indebtedness of any municipality or school district or a charge against the general taxing power thereof . . . . Notwithstanding the foregoing, a municipality or school district may guarantee payment of tax increment bonds or notes . . . . In such instance, appropriate

notation of such shall be reflected in the recitals of each bond or note.

53 Pa. Cons. Stat. § 6390.9(h).

Like the RAB Law, the bonding framework in *Sage* specified the bonds issued are non-recourse unless the municipality chooses to guarantee payment. However, the Court did not base its decision on—let alone mention—that the distinction between recourse and non-recourse bonds had an impact on whether a municipality could be classified as a market participant. *See Sage*, 390 F.3d at 216–18. Newark reads this lack of discussion as support, arguing "nothing in the *Sage* decision limited that Court's holding (that Pittsburgh was a market participant) to only that subset of bonds for which the city affirmatively guaranteed payment" which means "Plaintiffs' claim that [Newark] has no proprietary interest in non-recourse bonds issued by it is an argument that has already been rejected." (ECF No. 14-1 at 15–16.)

Under the RAB Law, municipalities are afforded various avenues of providing financing. *See* N.J. Stat. Ann. § 40:12A-67. Municipalities can issue the bonds themselves, or "may apply to an authority to issue bonds, regardless of whether the redevelopment project is undertaken under municipal authority . . . or by a State entity redeveloper pursuant to a State entity redeveloper agreement." N.J. Stat. Ann. § 40:12A-67(a). The relevant "authority" to which the municipality may apply to issue bonds is the New Jersey Economic Development Authority ("NJEDA"). N.J. Stat. Ann. § 40A:12A-65. The bonds issued by any of these three entities can be secured by "payments in lieu of taxes (PILOTs), or special assessments, or both." N.J. Stat. Ann. § 40:12A-67(a). The PILOTs or special assessments "may be assigned directly by the municipality or the authority to the trustee for the bonds as payment or security for the bonds." N.J. Stat. Ann § 40A:12A-67(c). As noted above, bonds issued pursuant to the RAB Law "may be issued as non-recourse obligations" but unless a municipality takes action "to guarantee such bonds or otherwise

provide for a pledge of the municipality's full faith and credit," the bonds are not considered "to be direct and general obligations of the municipality" and those bonds "shall not be considered gross debt of the municipality . . . unless those bonds were guaranteed by the municipality." N.J. Stat. Ann. § 40A:12A-67(d). A municipality that chooses to assign PILOTs as payment or security for bonds "may also pledge a portion of those [PILOTs] as payment or security for bonds." N.J. Stat. Ann. § 40A:12A-67(h).

Importantly, the Local Finance Board reviews every bond issued pursuant to the RAB Law. N.J. Stat. Ann. § 40A:12A-67(g) ("A bond . . . whether issued by a municipality or an authority . . . shall be subject to the review and approval of the board."). As part of this review process, the board must consider the bond's financial impact on the municipality. *Id.* ("As part of the board's review and approval, it shall consider . . . whether the issuance of the redevelopment area bond will adversely impact the financial stability of the municipality or service area of the authority.").

Based on *Sage*, Plaintiffs make two points in support of its argument that Newark lacks a proprietary interest in the RABs it issues. (ECF No. 16-1 at 17.) First, Plaintiffs submit Newark "lacks a proprietary interest in RABs issued by the NJEDA or a similar authority in which it is not a constituent." (*Id.*) Second, Plaintiffs assert "Newark lacks a proprietary interest in RABs it issues and then assigns," but Plaintiffs concede Newark does have "a proprietary interest in RABs it issues and does not assign," which Plaintiffs argue, without support, "almost never happens." (*Id.*)

*Sage* did not address the impact of a municipality's assignment of debts on its role as a market participant, as Plaintiffs suggest. Before concluding the City of Pittsburgh was acting as a market participant, and not a market regulator, the Third Circuit noted the case before it was not "a situation in which the URA, having financed the project, has already retired its debt and therefore has no continuing interest in financial receipts from the TIF project." *Sage*, 390 F.3d at

218. Plaintiffs insert the phrase "or assigned" in this language to argue *Sage* found that a municipality issuing and then assigning its debt no longer has a continuing interest in that debt, and therefore, no longer has a proprietary interest. (ECF No. 16-1 at 17 ("*Sage* also cautions of another instance in which a municipality lacks a proprietary interest; namely, 'a situation in which the [issuer], having financed the project, has already retired [or assigned] its debt and therefore has no continuing interest in financial receipts from the . . . project.'" (citing 390 F.3d at 218)).) In a footnote, the *Sage* court highlighted a scenario, in which "a city sells property to a developer outright on condition that the latter enters into a labor agreement." 390 F.3d at 218 n.9. (citing *Hotel Emps. & Rest. Emps. Union, Loc. 2, AFL-CIO v. Marriott Corp.*, Civ. A. No. C-89-2707, 1993 WL 341286, at *7 (N.D. Cal. Aug. 23, 1993)). "In that instance," the Third Circuit noted, "because the city's economic interest would have been terminated, the city's imposition of a labor agreement condition could not be characterized as protecting or furthering a proprietary interest." *Id.* Based on that scenario, the Third Circuit noted "if the URA's interest were eliminated, the result might well be different." *Id.* Therefore, if Newark retained no interest in the projects financed pursuant to the Ordinance, it could be characterized as a market regulator, not a market participant.

Regardless of whether Newark or the NJEDA issues the bonds, Newark plays a crucial role in the development of the projects such that it can be classified as a market participant. If Newark issues the bonds itself, it would, as the URA did in *Sage*, have "a proprietary financial interest in [the project] that is the same of any (nonprofit) private entity that finances a development by issuing bonds." 390 F.3d 216–17. That is, as a bond issuer, Newark's "interest in the success of the project that will yield the tax revenues is precisely that of any developer who is relying upon cash flow to support debt service, repay bonds, and finance other development." *Id.* at 217.

While Plaintiffs argue Newark "does not retain any financial or economic interest" in RABs because "[a]s a matter of practice, virtually all RABs are issued by the NJEDA," this fact, even if true, does not transform Newark into a market regulator. (ECF No. 16-1 at 14.) Even if a bond is issued by the NJEDA, Newark plays a crucial role in establishing the parameters for the financing given to a project under the Ordinance such that Newark acts as a market participant with respect to those projects. Newark must make an affirmative decision that the bonds should be issued by the NJEDA. N.J. Stat. Ann. § 40A:12A-67(a)–(b) (noting a municipality "may apply to [the NJEDA] to issue bonds" and "if [the municipality] determines to issue bonds through an authority"). Newark may also designate the redevelopment area for which the bonds can be issued. *See* § 40A:12A-66(a) ("A municipality that has designated a redevelopment area . . . may provide for tax abatement within that redevelopment area and for [PILOTs]."). When there is no redevelopment project undertaken by a State entity, as here, and Newark designates a redevelopment area and chooses to issue bonds through the NJEDA, it "enter[s] into contracts with the [NJEDA] relating to that redevelopment project." N.J. Stat. Ann. § 40A:12A-67(b). Newark's "governing body" must ensure its contracts with the NJEDA meet two requirements: "(1) that all or a portion of the redevelopment project undertaken within the municipality will result in the redevelopment of the municipality" and "(2) that the contract with the authority . . . is a necessary or important inducement to the undertaking of the project . . . in that it makes the financing thereof feasible." *Id.* That is, the contract between the municipality and the authority is at the center of the NJEDA's issuance of RAB bonds for a municipal project, and the municipality has great discretion on what these contracts entail. *See id.* ("These contracts may be made . . . on any terms and conditions which may be requested by the municipality . . . as may be agreed to by the authority."). And if Newark issues bonds through the NJEDA, the Local Finance Board must "specifically

solicit comments from . . . the [NJEDA]," consider these comments, and determine whether the bonds issued through the NJEDA "will adversely impact the financial stability" of Newark. N.J. Stat Ann. § 40A:12A-67(g). Additionally, even if the NJEDA issues the bonds, Newark would retain its role as a "financier" because the PILOTs generated by Newark's tax abatements would be used to fund the repayment of bonds. N.J. Stat. Ann. § 40A:12-67(h) ("A municipality that has assigned any portion of the [PILOTs] . . . , may also pledge a portion of those [PILOTs] as payment or security for bonds in order to finance or refinance any cost or expense of the municipality . . . or authority."). Therefore, even when the NJEDA issues bonds, Newark plays a direct and significant role in the process of issuing bonds for projects covered by the Ordinance. That is, without Newark's action, the NJEDA cannot issue bonds in the first place.

As indicated above, whether Newark issues bonds itself or applies to the NJEDA to issue them pursuant to the RAB Law, that financing does not "simply reduce[] the developers' tax burden for a period of time." *Jersey City*, 836 F.3d at 419. Instead, when Newark itself issues bonds or issues them through the NJEDA, Newark has a "proprietary financial interest" in the projects under the Ordinance "that is the same as that of any (nonprofit) private entity that finances a development by issuing bonds." *Sage*, 390 F.3d at 216–17. The fact that Newark is not a "constituent"[4] of the NJEDA like the City of Pittsburgh was a constituent of the URA in *Sage* does not change this analysis. In *Sage*, the City of Pittsburgh's constituency in the URA was important because the URA was the issuer of bonds, not Pittsburgh. *Id.* at 217. Because the City of Pittsburgh

---

[4] While Plaintiffs argue the Third Circuit based its decision in *Sage* on the fact that the City of Pittsburgh was a constituent of the URA, the Third Circuit in *Jersey City* clarified that the City of Pittsburgh was deemed to have a proprietary interest in the projects it funded because it issued bonds through its redevelopment authority. *Jersey City*, 836 F.3d at 420. ("In *Sage*, for example . . . we held that Pittsburgh had a proprietary interest in the project *only* because the city, through its redevelopment authority, provided bond financing to the hotel and not because it had a general interest in economic redevelopment.").

was a constituent in the URA, the court found it was "a partner in the proprietary interests of the URA," as the bond issuer. *Id.* at 216. Here, the RAB Law specifically provides for bonds to be issued by either Newark or the NJEDA. If Newark does not decide the NJEDA should issue bonds, the NJEDA cannot issue them—the bond-issuing scheme under the RAB Law rises and falls with Newark's action. As such, Newark's direct involvement under the RAB Law when issuing bonds through the NJEDA cannot be classified as conduct "which is tantamount to regulation or policy making" such that it is rendered "a market regulator," and not "a market participant." *Hudson Cty. Bldg. & Const. Trades Council, AFL-CIO v. City of Jersey City,* 960 F. Supp. 823, 833 (D.N.J. 1996) (citing *Bldg. & Const. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Mass./R.I., Inc.,* 507 U.S. 218, 226–27 (1993)). Therefore, the role Newark plays in funding projects under the Ordinance pursuant to the RAB Law renders it "an investor, owner, or financier" in those projects. *Sage,* 390 F.3d at 216.

### b.    CDBGs Administered by Newark

Title I of the Housing Community and Development Act of 1974 created a federal funding program with the primary objective of developing "viable urban communities, by providing decent housing and a suitable living environment and expanding opportunities, principally for persons of low and moderate income." 42 U.S.C. § 5301(c). The program provides grants to cities based on a formula that considers factors like the city's population, extent of poverty, extent of housing overcrowding, extent of growth lag in the city, and the age of housing in the city. 42 U.S.C. § 5306(b)(1). The parties do not dispute Newark qualifies for these funds under the program's formula and has received them in the past. (ECF No. 14-1 at 13; ECF No. 16-1 at 18). Newark can spend the funds it receives through the CDBG program on activities like construction of housing,

24 C.F.R. § 570.201(m), and real estate acquisition, 24 C.F.R. § 570.203(a), subject to certain criteria and reporting requirements.

Plaintiffs allege Newark's distribution of federal funds through CDBGs as a form of financing violates the NLRA, since Newark has no proprietary interest in the project and is not acting as a market participant. (ECF No. 1 ¶ 41.)

The Supreme Court in *White v. Massachusetts Council of Const. Emps., Inc.*, considered the constitutionality of an executive order issued by the Mayor of Boston requiring "all construction projects funded in whole or in part by city funds, or funds which the city had the authority to administer" be performed by a work force, half of which had to consist of Boston residents. 460 U.S. 204, 205–06 (1983). In assessing the executive order's constitutionality, the Supreme Court determined whether Boston, just like Newark here, was acting permissibly as a market participant, or impermissibly as a market regulator. *See id.* at 208–09. The narrow issue before the Supreme Court was "the propriety of applying the mayor's executive order to projects funded wholly with city funds and projects funded in part with federal funds." *Id.* at 209.

In *White*, the Mayor's executive order applied to certain kinds of federal funds including, as here, CDBGs. *Id.* at 212. The Supreme Court noted "[w]here state or local government action is specifically authorized by Congress, it is not subject to the Commerce Clause even if it interferes with interstate commerce." *Id.* at 213. Therefore, "if the restrictions imposed by the city on construction projects financed in part by federal funds are directed by Congress then no dormant Commerce Clause issue is presented." *Id.* The Supreme Court found the executive order's preference for a labor force largely consisting of Boston residents "was affirmatively sanctioned by" the regulations of the federal programs from which Boston was using to fund its projects. *Id.* at 215. Specifically, the CDBG regulation at issue in *White* required that a recipient of funds

provide "opportunities for training and employment be given to lower-income residents of the project area" and contracts for work related to the project "be awarded to eligible business concerns which are located in . . . the area of the project." 24 C.F.R. § 570.307(m)(1982). Because the order fulfilled these requirements, the Supreme Court found Boston's contracts did not violate the Commerce Clause. *Id.* at 214.

Newark argues that in *White*, the Supreme Court "determined that the City of Boston was not subject to preemption with respect to the use of its own funds or Community Development Block Grant funds." (ECF No. 18 at 10.) However, as cases following *White* clarify, *White* did not hold that the mere use of federal funds by a city negated a preemption analysis. Rather, because Boston used those funds as Congress intended, Boston's contracts were not subject to preemption. *See Norfolk S. Corp. v. Oberly*, 822 F.2d 388, 397 (3d Cir. 1987) ("*White* did not go so far as to suggest that the mere making of federal grants was authorization for any parochial state action that might arise in the use of those funds.").

The regulations set forth in 24 C.F.R. § 570.209 provide the guidelines for evaluating and selecting economic development projects. The guidelines specifically apply "to activities that are eligible to CDBG assistance under § 570.203." 24 C.F.R. § 570.209. Section 570.203 states a receipt of CDBG funds may use those funds "for special economic development activities." 24 C.F.R. § 570.203. Special economic development activities include "the acquisition, construction, reconstruction, rehabilitation or installation of commercial or industrial buildings, structures, and other real property equipment and improvements," but do not include "assistance for the construction of new housing." 24 C.F.R. § 570.203(a). The guidelines in 24 C.F.R. § 570.209 "are composed of two components: guidelines for evaluating project costs and financial requirements and standards for evaluating public benefit." 24 C.F.R. § 570.209. Notably, "[t]he standards for

evaluating public benefit are mandatory," while "the guidelines for evaluating projects costs and financial requirements are not." *Id.* 24 C.F.R. § 570.209(b)(1) requires activities covered by the guidelines to either (1) create one permanent job per $35,000 of CDBG funds used or (2) provide goods or services to an area such that number of residents assisted in that area amount to at least one person per $350 of CDBG funds used. 24 C.F.R. § 570.209(b)(1)(i)–(ii). However, certain activities, "may . . . be excluded from the aggregate standards described in paragraph (b)(1)." 24 C.F.R. § 570.209(v).

One of the activities covered by 24 C.F.R. § 570.209(v) includes providing "jobs predominantly for low-skilled, low- and moderate-income persons, where the business agrees to provide clear opportunities for promotion and economic advancement, such as through the provision of training." 24 C.F.R. § 570.209(v)(D). The Ordinance specifically implements an "Apprenticeship Program" which is defined as a "program providing to each trainee combined classroom and on-the-job training under the direct and close supervision of a highly skilled worker in an occupation recognized as an apprentice able trade." (Ordinance § 2:4-22D.1.) In connection with this program, the Ordinance requires that "each contractor agree to be monitored by a New Jersey State and Federal agency to ensure that minorities, women or economically disadvantaged persons are afforded the opportunities to participate in apprenticeship programs, which result in the placement of apprentices on the project." (Ordinance, § 2:4–22D.3(1)(H)).

Therefore, the CDBG funds are not being used merely to "authoriz[e] . . . any parochial state action." *Norfolk S. Corp.*, 822 F.2d at 397. Instead, the Apprenticeship Program in the Ordinance specifically carries out an activity "affirmatively sanctioned by" the regulations of the CDBG programs from which Newark is using to fund its projects under the Ordinance by requiring contractors to ensure low-skill and low-income persons receive training opportunities and job

placements. *White*, 460 U.S. at 215.[5] Additionally, cases following *White* have held that when a city administers federal funds, that city has a proprietary interest in those funds. *See Metro. Washington Chapter v. D.C.*, 57 F. Supp. 3d 1, 7, 11, 27 (D.D.C. 2014) (finding "Plaintiffs [could not] credibly dispute the fact that the [District of Columbia was] acting as a market participant" when the District enacted "a residential preference statute for the construction industry" in which certain construction projects received "funds or resources which, in accordance with a federal grant or otherwise, the District of Columbia government administer[ed]"); *see also Swin Res. Sys., Inc. v. Lycoming Cty., Pa. Through Lycoming Cty. Solid Waste Dep't*, 883 F.2d 245, 250 (3d Cir. 1989) (rejecting argument that Lycoming County "cannot be a market participant because the landfill is on federal government land and its start-up costs were paid for, in part, with federal funds" and, after reviewing *White*, finding "a federal subsidy cannot distinguish Lycoming's preference for local garbage from Boston's hiring preference for jobs on construction projects funded by city-administered federal grant money"). Because Newark administers the federal funds it receives through CDBGs and uses those funds as Congress intended, Newark has a proprietary interest in the funds it receives as CDBGs.

Plaintiffs do not allege, or point to in their brief, how Newark is not complying with the CDBG regulations at issue here. Without these allegations or proof, the Court cannot find that Newark was not "affirmatively sanctioned by" the CDBG regulations. Because Newark administers the federal funds it receives through CDBGs and uses those funds as Congress

---

[5] Another activity included in 24 C.F.R. § 570.209 is a project that "provides employment opportunities that are an integral component of a project designed to promote spatial deconcentration of low- and moderate-income and minority persons." 24 C.F.R. § 570.209(v)(J). While the Ordinance does not specifically indicate its goal is to "promote spatial deconcentration," it does include several provisions aimed at providing employment opportunities for minorities. *See* Ordinance § 2:4-22D.3(1)(F), (H), (J)–(L).

30

intended, Newark has a proprietary interest in the funds it receives as CDBGs. Accordingly, because Newark's issuance of bonds pursuant to the RAB Law and its implementation of CDBG funds render it a market participant, the first *Sage* step is satisfied.

### ii.     *Sage* Step Two

Under *Sage*'s second prong, a court must determine whether "the scope of the funding condition [is] 'specifically tailored' to the proprietary interest." *Sage*, 390 F.3d at 216; *Jersey City*, 836 F.3d at 418. Both prongs must be satisfied to find a government is acting as a market participant. *Id.* Defendants argue the Ordinance is specifically tailored to protect its proprietary interests. (*See* ECF No. 14-1 at 17; *see also* ECF No. 15-1 at 22–23.) Plaintiffs concede "the Ordinance, on its face" appears to be tailored to Newark's proprietary interest. (ECF No. 16-1 at 22 (noting if "some form of Redevelopment Area Financing transforms the City of Newark into a market participant . . . then the PLA requirement would be advancing a specific proprietary interest.").)

Here, the Ordinance only applies to projects that (1) exceed $25,000,000.00; (2) receive a tax abatement from Newark; and (3) receive additional forms of funding, which includes funding pursuant to the RAB Law, financing pursuant to the Local Redevelopment and Housing Law, funds received as CDBGs, direct payments by Newark in the form of rent, or any other municipal or UEZ capital financing. (Ordinance § 2:4-22D.1.) That is, Newark will only require developers to execute a PLA if these three conditions are met. (Ordinance § 2:4-22D.2.) However, even if these three conditions are met, the Business Administrator can determine that a PLA "is not appropriate," after "taking into consideration the amount of City financial resources required and the increased cost and feasibility challenges that would result to the Project." (*Id.*) In any case, a PLA must always advance Newark's interests. (*Id.* ("In all cases, the [PLA] must advance the

31

interests of the City of Newark, including cost, efficiency, quality, time, time lines and need for a skilled labor force and safety.").) Therefore, the Ordinance's PLA requirement only applies when a construction project meets all three conditions and the Business Administrator determines a PLA is appropriate for a given project, so the Ordinance does not apply to all construction projects undertaken in Newark. *See New Castle Cty.*, 144 F. Supp. 3d at 639 (in assessing whether a county's proprietary interest was "specifically tailored" under *Sage*, "the crucial factor" was whether the county's code requiring participation in an apprenticeship program "appl[ied] to every construction project" in the county) (citing *Lott Constructors*, 1994 WL 263851, at *11–12)); *c.f. Tri-M Grp., LLC v. Sharp*, 638 F.3d 406, 422–23 (3d Cir. 2011) (rejecting Delaware apprenticeship regulations that were "not limited in scope only to contracts in which the state directly participates in a funding or procurement capacity"). Additionally, *Sage* specifically addressed how PLAs can further a city's proprietary interest in construction projects. 390 F.3d at 217 (noting the ordinance, which "condition[ed] funding on the employer entering into an agreement to eliminate picketing, work stoppages, and other economic disruptions," "directly promote[d]" the interest in "relying upon cash flow to support debt service, repay bonds, and finance other development."). Because the Ordinance only applies to a subset of projects within Newark and furthers Newark's proprietary interest in those projects, the Ordinance is narrowly tailored and satisfies *Sage*'s second prong. Since both *Sage* prongs are met, the Court finds Newark is acting as a market participant and the Ordinance is not subject to preemption by the NLRA or ERISA.

Accordingly, Counts I and III of Plaintiffs' Complaint are **DISMISSED without prejudice**.

### 2.     Privileges and Immunities Clause/Commerce Clause Claim (Count II)

Plaintiffs' second cause of action alleges violations of the Privileges and Immunities Clause and the Commerce Clause. (ECF No. 1 ¶¶ 43–48.) Newark argues Plaintiffs' Complaint does not demonstrate "how the Ordinance fails the two-part test for analyzing a law under the Privileges and Immunities Clause" established in *United Bldg. & Const. Trades Council of Camden Cty. & Vicinity v. Mayor & Council of City of Camden* ("*Camden*"), 465 U.S. 208 (1984). (ECF No. 14-1 at 20–23.) Both Newark and Essex argue Plaintiffs lack standing to challenge the Ordinance under the Privileges and Immunities Clause. (ECF No. 14-1 at 23; ECF No. 15 at 25–27.) Plaintiffs, relying on *Camden*, argue their Complaint sufficiently states a cause of action for violation of the Privileges and Immunities Clause. (ECF No. 16-1 at 27–30.) Plaintiffs further argue because Newark is acting as a market regulator, its "demand that a certain number of employees be Newark residents" violates the Commerce Clause. (*Id.* at 30.)

The Privileges and Immunities Clause of the United States Constitution provides "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const. art. IV, § 2. The Supreme Court has interpreted this clause to include municipal residency ordinances "based on the relationship between the state and its municipality: since a municipality is granted its power to act from the state, it is as subject to the Clause as the state would be." *Salem Blue Collar Workers Ass'n v. City of Salem*, 33 F.3d 265, 267 (3d Cir. 1994) (citing *Camden*, 465 U.S. at 214–15).

In *Camden*, the Supreme Court reviewed a municipal ordinance enacted by the City of Camden, New Jersey that required "at least 40% of the employees of contractors and subcontractors working on city construction projects be Camden residents." 465 U.S. at 210. The United Building and Construction Trades Council of Camden and Vicinity argued Camden's

ordinance violated the Privileges and Immunities Clause. *Id.* The Supreme Court found individuals residing outside of Camden, but within New Jersey, lacked standing to challenge Camden's ordinance under the Privileges and Immunities Clause. *Id.* at 217 ("It is true that New Jersey citizens not residing in Camden will be affected by the ordinance as well as out-of-state citizens. And it is true that the disadvantaged New Jersey residents have no claim under the Privileges and Immunities Clause." (citing *The Slaughter-House Cases*, 83 U.S. 36, 77 (1872))). The Court also noted one of the member associations belonging to the Trades Council had standing to challenge Camden's ordinance under the Privileges and Immunities Clause because "[t]he Council ha[d] at least some members who reside outside New Jersey." *Id.* at 212 n.4. The Supreme Court then clarified that challenges to laws under the Privileges and Immunities Clause involve a two-step inquiry. *See id.* at 218. First, "the court must decide whether the ordinance burdens one of those privileges and immunities protected by the Clause." *Id.* (citing *Baldwin v. Mont. Fish & Game Comm'n*, 436 U.S. 371, 383 (1978)). In addressing this first prong, a court "must determine whether an out-of-state resident's interest in employment on public works contracts in another State is sufficiently 'fundamental' to the promotion of interstate harmony so as to 'fall within the purview of the Privileges and Immunities Clause.'" *Id.* (quoting *Baldwin*, 436 U.S. at 388)). Under the second prong, if the challenged ordinance is found to burden one of the privileges and immunities protected by the Privileges and Immunities Clause, a court must then determine whether "there is a 'substantial reason' for the difference in treatment" and "whether the degree of discrimination bears a close relation to [those reasons]." *Id.* at 222 (quoting *Toomer v. Witsell*, 334 U.S. 385, 396 (1948)).

Here, Plaintiffs argue they "are not *individuals*, but rather, real estate developers/contractors who currently and regularly employ out-of-state workers and

subcontractors to assist on their projects." (ECF No. 16-1 at 27.) Therefore, Plaintiffs contend they "are akin to the member association in *Camden* and currently have standing to pursue their [Privileges and Immunities] claim." (*Id.*) However, Plaintiffs' Complaint only alleges it hires out-of-town individuals, not out-of-state individuals. (*See* ECF No. 1 ¶ 45 (asserting the Ordinance violates the Privileges and Immunities Clause "because it unlawfully discriminates against out-of-town individuals and those entities, such as Plaintiffs, who employ out-of-town individuals who have the requisite skill, knowledge, experience, and education to efficiently work and complete privately owned construction projects in the City of Newark").) The challenges made in Plaintiffs' Complaint are more similar to the challenges made by the individuals in *Camden* residing outside of Camden, but within New Jersey that were rejected by the Supreme Court as lacking standing. *See Camden*, 465 U.S. at 217. If Plaintiffs specifically alleged they hired out-of-state individuals, as opposed to merely out-of-town individuals, this Court would have reason to analyze the Ordinance under the two-step test applied by *Camden. See Salem Blue Collar Workers Ass'n*, 33 F.3d at 267–68 (affirming district court's conclusion "that the Association had standing on its privileges and immunities claim because the complaint alleged that the Association was comprised, *inter alia*, of members who lived outside the State of New Jersey and others who might live outside the state but for the ordinance"). Therefore, because Plaintiffs do not allege they employ out-of-state individuals, they lack standing to bring a claim under the Privileges and Immunities Clause. And because the Court has already determined Newark is acting as a market participant—not a market regulator—under the Ordinance, Plaintiffs do not state a claim under the Commerce Clause.

Accordingly, Count II of Plaintiffs' Complaint is **DISMISSED**. However, as Plaintiffs request, this Count will be dismissed without prejudice, and Plaintiffs will be afforded an

opportunity to amend their Complaint to add the out-of-state employees or subcontractors they argue they employ.

### 3. New Jersey Civil Rights Act, New Jersey State Constitution, and 42 U.S.C § 1983 Claims (Counts IV and V)

Count IV of Plaintiffs' Complaint alleges violations of the New Jersey Civil Rights Act ("NJCRA") and New Jersey State Constitution. (ECF No. 1 ¶¶ 54–56.) Count V of Plaintiffs' Complaint alleges a violation of 42 U.S.C. § 1983. (*Id.* ¶¶ 57–60.) Newark argues "Plaintiffs' § 1983 and New Jersey State claims must be dismissed" because Plaintiffs have not been denied any rights, privileges, or immunities. (ECF No. 14-1 at 25.) Plaintiffs assert their claims under these counts should not be denied because they have set forth entitlement to relief under the Supremacy Clause, Commerce Clause, and Privileges and Immunities Clause, and their causes of action under the NJCRA, New Jersey Constitution, and under 42 U.S.C. § 1983 "rise and fall with this Court's determination" of their constitutional claims. (ECF No. 16-1 at 32.)

The NJCRA provides, in pertinent part, a private cause of action to

> [a]ny person who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law.

N.J. Stat. Ann. § 10:6–2(c). The NJCRA was modeled after § 1983, and "courts in New Jersey have consistently looked at claims under the NJCRA 'through the lens of § 1983,'" thereby construing the NJCRA in terms similar to its federal counterpart. *Samoles v. Lacey Twp.*, Civ. A. No. 12–3066, 2014 WL 2602251, at *15 (D.N.J. June 11, 2014) (citation omitted); *see Hartfelder v. N.J. State Police*, Civ. A. No. 165461, 2017 WL 3184173, at *5 (D.N.J. July 26, 2017);

*Armstrong v. Sherman*, Civ. A. No. 09–716, 2010 WL 2483911, *5 (D.N.J. June 4, 2010). This Court has repeatedly interpreted the NJCRA analogously to § 1983. *See Chapman v. New Jersey*, Civ. A. No. 08–4130, 2009 WL 2634888, *3 (D.N.J. August 25, 2009) ("Courts have repeatedly construed the NJCRA in terms nearly identical to its federal counterpart: Section 1983."); *Armstrong*, 2010 WL 2483911 at *5 ("[T]he [NJRCA] is a kind of analog to section 1983."). The NJCRA is therefore generally interpreted nearly identically to § 1983 and claims under the NJCRA are generally contemporaneous with and subject to the same defenses and immunities as those brought under § 1983. *Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443–44 (D.N.J. 2011). "Therefore, the Court will analyze Plaintiffs' NJCRA claims through the lens of § 1983." *Id.* at 444. Because the Court has found the Ordinance does not violate the Supremacy Clause, the Commerce Clause, or the Privileges and Immunities Clause, and Plaintiffs' claims under Counts IV and V "rise and fall" with a determination of those claims, Counts IV and V of Plaintiffs' Complaint are **DISMISSED without prejudice**.

> ### C.   Plaintiffs' Cross Motion for Judgment on the Pleadings

Also before the Court is Plaintiffs' Cross Motion for Judgment on the Pleadings. (ECF No. 19.). Plaintiffs' motion argues a preemption analysis is required because Newark "is acting as a regulator in instances where the NJEDA issues the RAB or where Newark issues the RAB and later assigns its interest" and when Newark "provides CDBG funding." (ECF No. 16-1 at 23.) These same arguments have been addressed and dismissed above in the Court's discussion of Counts I and III of Plaintiffs' Complaint. Accordingly, Plaintiffs' Cross Motion is **DENIED**.

## IV.   CONCLUSION

For the reasons set forth above, Defendants' Motions to Dismiss are **GRANTED**, Plaintiffs' Complaint is **DISMISSED without prejudice**, and Plaintiffs' Cross Motion for Judgment on the Pleadings is **DENIED.**

Date: July 30, 2021                          */s/ Brian R. Martinotti*
                                             **HON. BRIAN R. MARTINOTTI**
                                             **UNITED STATES DISTRICT JUDGE**